JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
By: Alexander Li
Assistant United States Attorney
26 Federal Plaza, 38th Floor
New York, New York 10278
Tel: (212) 637-2265

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- v. -

$8,388,824.85 IN UNITED STATES CURRENCY FORMERLY ON DEPOSIT IN CLEAR STREET LLC ACCOUNT NUMBER 115157, HELD IN THE NAME OF IMPERIAL VISION FUND SPC – SERIES 1 SP, AND ALL FUNDS TRACEABLE THERETO; and

CERTAIN SECURITIES CONTAINED IN CLEAR STREET LLC ACCOUNT NUMBER 115157, HELD IN THE NAME OF IMPERIAL VISION FUND SPC – SERIES 1 SP, AND ALL FUNDS TRACEABLE THERETO,

Defendants-*in-rem*.

**AMENDED VERIFIED CIVIL COMPLAINT FOR <u>FORFEITURE</u>**

**26 Civ. 5545 (MMG)**

Plaintiff United States of America, by its attorney, James M. McDonald, United States Attorney for the Southern District of New York, for its verified civil complaint, alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

1. This is a civil action *in rem* commenced by the United States of America pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C), seeking to forfeit the following assets and all funds traceable thereto:

a. $8,388,824.85 in United States currency (the "Seized Funds") formerly on deposit in Clear Street LLC Account Number 115157 held in the name of Imperial Vision Fund SPC – Series 1 SP (the "Subject Account");

b. The following securities contained in the Subject Account:

i. 500 shares of Vanguard Total World Stock Index ETF (VT);

ii. 500 shares of Oracle Corp. (ORCL);

iii. 500 shares of Microsoft Corp. (MSFT);

iv. 500 shares of Alphabet Inc. (GOOGL);

v. 1,000 shares of NEOS Nasdaq-100 High Income ETF (QQQI);

vi. 123 shares of Dreamland Ltd. (TDIC);

vii. 500 shares of SPDR Gold Shares (GLD)

(i. through vii., collectively, the "Seized Shares").

2. This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Sections 1345 and 1355.

3. Venue is proper pursuant to Title 28, United States Code, Section 1395 because (i) the Seized Funds are currently held in the Seized Asset Deposit Fund Account of the United States Marshals Service (the "USMS") located within the judicial district for the Southern District of New York; and (ii) the Seized Shares (together with the Seized Funds, and all funds traceable thereto, the "Defendants-*in-rem*") are also located within the judicial district for the Southern District of New York. Venue is also proper pursuant to Title 28, United States Code,

Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

4. As set forth below, there is cause to believe that the Defendants-*in-rem* are subject to forfeiture pursuant to (i) Title 18, United States Code, 981(a)(1)(C), as property constituting or derived from proceeds traceable to (a) wire fraud, in violation of Title 18, United States Code, Section 1343; and (b) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (c) securities fraud, in violation of Title 18, United States Code, Section 1348; and (ii) Title 18, United States Code, Section 981(a)(1)(A) as property involved in money laundering, in violation of Title 18, United States Code, Section 1956 and 1957 (collectively, the "Subject Offenses").

## II. BASIS FOR FORFEITURE

5. This action arises out of an investigation conducted by the Federal Bureau of Investigation ("FBI") into Dreamland Limited ("Dreamland" or "TDIC"), which trades on the Nasdaq Capital Market stock exchange under the ticker TDIC. Dreamland is a purported event management company that operates in Hong Kong.

6. As set forth below, Dreamland conducted a pump-and-dump in October 2025 and again in May 2026. In particular, on or about May 13 and 14, 2026, the share price of TDIC surged more than ten-fold, with at least some of the increase apparently driven by deceptive promotional campaigns. Around the same time, compromised account credentials of a financial advisory firm were used to purchase approximately $18.2 million of TDIC stock. During this pump and dump, the Subject Account — whose account holder acquired a large quantity of TDIC shares directly from Dreamland — sold TDIC shares for proceeds of approximately $17.7 million. Some

of these proceeds were used to purchase other securities in the Subject Account, and, as of June 15, 2026, approximately $8.4 million in cash remained in the account.

7. On or about June 15, 2026, the Honorable Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, issued a seizure warrant, 26 Mag. 2334, authorizing the seizure of all cash in the Subject Account (i.e., the Seized Funds) and the Seized Shares. The warrant authorized the seizure of, among other things, 3,090 TDIC shares. Due to a 1-for-25 reverse stock split that occurred on or about June 15, 2026, these 3,090 shares of TDIC are now 123 shares. A copy of the Seizure Warrant is attached as Exhibit A and incorporated by reference as set forth fully herein.

**Background on Pump and Dump Schemes**

8. A "pump and dump" or "ramp and dump" is a common market-manipulation scheme wherein bad actors obtain a microcap issuer's stock at a relatively cheap price, drive up the price of the stock through various means (the "ramp" or the "pump"), and then suddenly sell their holdings of the stock once the price has sufficiently increased (the "dump"), thus allowing the bad actors to profit at the expense of other investors who are unaware that the stock price has been artificially inflated through the scheme. These schemes are most common in "microcap" stocks, where the issuers have a market capitalization of under $300 million.

9. To manipulate the price of stock, bad actors often employ deceptive promotional campaigns and unauthorized account intrusions to generate artificial buying pressure on a stock. The stock is often issued by a foreign microcap company, whose small market capitalization facilitates dramatic changes in stock price and whose foreign issuance stymies enforcement by U.S. authorities. The promotional campaigns often occur through social media and text message groups and often involve promising investors massive returns from buying the stock

in question. In addition to false promotional activity, these schemes can involve unauthorized access to retail brokerage accounts through exploitation of weak security controls; once conspirators have gained unauthorized access to such accounts, they engage in unauthorized trading to artificially inflate prices and trading volume in the thinly traded stocks. The artificial buying pressure, whether from social media-induced investors or account takeovers, "pumps" or "ramps" prices to dramatically elevated levels. Once the price spike is achieved, the bad actors and their affiliates "dump" their pre-positioned holdings by selling into the elevated market. After the bad actors and their affiliates complete their sales, the stock price collapses, and retail investors are left with near-worthless shares.

**Background on TDIC**

10. On or about April 11, 2025, Dreamland filed with the Securities and Exchange Commission ("SEC") a registration statement on Form F-1[1] for an initial public offering ("IPO") of TDIC shares. According to the registration statement, Dreamland is "an event management service provider based in Hong Kong with over eight years of experience in managing the entire or part of the event lifecycle for our customers." The registration statement advised that Dreamland is a holding company incorporated on July 5, 2024 in the Cayman Islands and primarily operates through its Hong Kong-based subsidiary, incorporated in Hong Kong. In accompanying preliminary prospectuses, Dreamland anticipated offering 2,000,000 shares in the IPO at an initial offering price of $4.00 and registering up to 5,416,740 additional shares for resale.

[1] SEC Form F-1 is a mandatory registration document filed with the SEC by foreign companies seeking to list their shares on a U.S. stock exchange.

11. On or about July 23, 2025, Dreamland's IPO closed. On the same day, TDIC shares began trading on the Nasdaq stock exchange, which is based in Manhattan, New York. Prior to this offering, there was no public market for these shares.

12. Within four months, on or about November 28, 2025, Dreamland filed with the SEC a report on Form 6-K ("Report of Foreign Private Issuer") advising that on November 26, 2025, Nasdaq notified Dreamland that it was out of compliance with Nasdaq's required $1.00 minimum bid price for the preceding 30 consecutive business days. Nasdaq gave Dreamland 180 days, or until May 26, 2026, to regain compliance with the $1.00 minimum price requirement. To regain compliance, Dreamland's closing bid price had to remain at or above $1.00 per share for at least ten consecutive business days. If Dreamland failed to regain compliance, it would be subject to delisting[2] from the Nasdaq stock exchange.

13. On or about March 6, 2026, Dreamland filed with the SEC a registration statement on Form F-1 for a follow-on public offering ("FPO") directly to select investors. As later adjusted after the 1-for-5 reverse stock split described immediately below, Dreamland anticipated selling in the FPO up to 6,000,000 shares of TDIC at an assumed public offering price of $0.75 per share, and up to 30,000,000 warrants[3] to purchase up to 30,000,000 shares of TDIC at an assumed exercise price of $0.05 per share.

14. On or about April 13, 2026, Dreamland filed with the SEC a report on Form 6-K, announcing that it expected to implement a 1-for-5 reverse stock split, effective on April 20,

---

[2] When a stock is delisted, shareholders still own their shares, but trading shifts from a national exchange to over-the-counter ("OTC") markets, often resulting in reduced liquidity, wider bid-ask spreads, and reduced price transparency. As a practical matter, retail investors have limited access to OTC markets, and so delisting makes it more difficult to use retail investors to "pump" a stock.

[3] A stock warrant is a contract that gives the holder the right, but not the obligation, to buy shares at a specified price during a specified time frame.

2026. A reverse stock split consolidates a stock's existing shares into fewer new shares. Thus, in a 1-for-5 reverse split, every five shares are replaced with a single new share, and the price of the new shares is increased proportionally. Issuers of low-price stocks often conduct reverse stock splits in order to meet minimum price thresholds to remain listed on U.S. exchanges. By increasing TDIC's stock price fivefold, the 1-for-5 reverse stock split would make it more likely that TDIC could regain compliance with Nasdaq's $1.00 minimum price requirement and thus avoid delisting.

15. On or about April 23, 2026, Dreamland filed with the SEC a report on Form 6-K, announcing the initial closing of the FPO. TDIC subsequently provided the Financial Industry Regulatory Authority ("FINRA") with certain information about the investors in the FPO. According to this information, Imperial Vision SPC – Series 1 SP ("Imperial Vision") — which is the holder of the Subject Account — purchased approximately 229,080 (post-split) shares of TDIC, and purchased and exercised warrants to acquire another 1,145,400 (post-split) shares of TDIC.

16. On or about May 8, 2026, Dreamland filed with the SEC a report on Form 6-K, advising that on May 5, 2026, Nasdaq informed Dreamland that it had regained compliance with the $1.00 minimum bid price requirement for continued listing on the Nasdaq stock exchange.

**The October 2025 Pump and Dump**

17. After Dreamland's IPO, from on or about July 29, 2025 to on or about September 22, 2025, TDIC's closing share price ranged between $17.50 and $21.35, with daily trading volume peaking at approximately 20,079 daily shares traded. Starting on or about September 23, 2025, the share price closed at $22.30 and continued to rise until on or about October 7, 2025, with a closing price of $36.35. The daily trading volume hit a high of nearly 1.5

million daily shares traded during this time period. This was followed by a sharp decline in the stock's closing price over the ensuing trading days, with a closing price of $3.75 on October 14, 2025. Between on or about October 15, 2025 and on or about December 31, 2025, TDIC's share price continued to decline, closing at $0.93 per share on December 31, 2025.

18. Between on or about October 15, 2025 and on or about January 12, 2026, the FBI received approximately eight complaints through IC3.gov, the official website for the Internet Crime Complaint Center (IC3), alleging fraud relating to TDIC. For example, one victim reported that she lost approximately $350,000 after joining a WhatsApp group chat called "VIP Guidance Group" that pressured members to buy and increase positions in specific stocks, including TDIC.[4] The victim reported that she was "misled into making large investments, pressured to add more, and ultimately wiped out financially." As another example, a victim reported that he was invited to join a WhatsApp group chat by someone purportedly working with a U.S. hedge fund. The victim reported that he "was instructed to purchase approximately **93,099 shares [of TDIC] at around $7.15**, and on Oct 10, 2025, during market hours, the stock suddenly collapsed." The victim reportedly "was forced to liquidate [TDIC] positions at $4.01 and $2.68, resulting in realized losses over **$406,000**."

19. TDIC's volatility in October 2025 — and again in May 2026, as described below — is consistent with a pump-and-dump scheme. Specifically, TDIC's abrupt and substantial increase in trading volume and share price coincided with promotional activity and investor complaints alleging misleading representations and induced purchases, followed by a subsequent decline in the stock price, leaving many investors with substantial losses.

---

[4] WhatsApp is a messaging application that enables users to communicate by text, voice, and video over the Internet. Private messaging groups, including on WhatsApp, are often used to drive retail interest in stocks.

**The May 2026 Pump and Dump**

20. Between on or about January 2, 2026 and on or about May 12, 2026, TDIC's closing share price ranged between $0.57 on March 30, 2026 and $2.36 on May 12, 2026, with an average daily trading volume of approximately 2.6 million shares. On May 13, 2026, however, TDIC's stock price surged once again to a high of $30.00 per share, before closing at $23.05 on volume of approximately 109 million shares. The next day, May 14, 2026, TDIC's share price opened at $21.49 and declined to a low of $0.80, which was the closing share price. On June 12, 2026, TDIC share price closed at $0.23.

21. On or about May 12, 2026 at 5:12 a.m. Eastern Time, Dreamland issued a press release announcing that its subsidiary had entered into a non-binding memorandum of understanding with LinkFung Innovation Limited, a Hong Kong-based technology firm claiming to specialize in "high-end AI development, cloud infrastructure, and data management." According to the press release, "[b]y integrating LinkFung Innovation's advanced AI capabilities," Dreamland aimed to "explore the development, implementation and deployment of a comprehensive AI-powered intelligent image library platform integrating advanced artificial intelligence features, scalable cloud infrastructure, and a robust database system." The press release did not explain how an "AI-powered intelligent image library platform" would relate to Dreamland's purported event-management business.

22. Notably, this press release was issued before the start of trading on May 12, 2026, and TDIC's stock price closed that day at $2.36 per share. It therefore appears unlikely that the May 12, 2026 press release explains the dramatic surge in TDIC's stock price on May 13-14, 2026, when the stock price reached a high of $30 per share. Instead, the sudden increase in TDIC's stock price on May 13 and 14, 2026 appears to have been driven, at least in part, by deceptive

online promotional campaigns. In addition, an unauthorized brokerage account intrusion appears to have been conducted to attempt to inflate TDIC's price by unsuccessfully attempting to buy a massive quantity of TDIC stock.

23. On or about May 14, 2026, a U.S. brokerage ("Brokerage-1") notified FINRA of unauthorized trades as a result of compromised login credentials. Brokerage-1 reported that the credentials, which belonged to representatives of a third-party financial advisory firm ("Firm-1") that used Brokerage-1's trading platform, were used to transact a large volume of TDIC stock on May 14, 2026 at approximately 10:30 am Eastern Time. Based on Firm-1 records, it appears that the compromised credentials were used to purchase, between approximately 10:06 a.m. and 10:43 a.m. Eastern Time, approximately 1,083,707 shares of TDIC for a total price of approximately $18.2 million (an average share price of approximately $16.79). The use of compromised brokerage accounts to place massive buy orders is consistent with a coordinated pump-and-dump scheme. I understand from Firm-1 that Firm-1 repurchased from its clients, at the total execution price of approximately $18.2 million, the TDIC shares that were purchased using compromised Firm-1 credentials, thereby making its clients whole. Firm-1 then sold the TDIC shares on the market for a total price of approximately $3.8 million, resulting in a net loss of approximately $14.4 million to Firm-1.

24. On or about May 11, 2026, a financial influencer known as Grandmaster-Obi ("Grandmaster"), circulated an alert inside a Discord channel called "Making Easy Money Discord,"[5] promoting TDIC at an entry price of $1.20 per share. By May 13, 2026, TDIC had

[5] Discord is a messaging platform that users can access through a desktop application, a mobile application, or the Discord website. Registered Discord users can create or join private "servers," which are broken down into sub-categories, or "channels," through which users can communicate with each other by chat, voice, or video. Among other things, users can send communications to

reached a high of $30.00 per share. This promotional activity over Discord, which echoes the WhatsApp groups used to solicit victims of the October 2025 pump and dump, effectively urged retail traders to buy TDIC stock. A screenshot of Grandmaster's promotion is as follows:




25. On or about May 14, 2026, at least two financial influencers with significant social media audiences, including Grandmaster, publicly promoted TDIC as a "short squeeze" play. A short squeeze is a rapid increase in the price of a stock that has significant "short" seller interest[6]. The short squeeze is sometimes driven by retail traders, who initially purchase the stock and drive up its price. As the stock price increases, short sellers are forced to buy the stock to avoid further losses, thus further driving up the price and putting additional pressure on other short sellers. By promoting TDIC as a short squeeze play, the influencers encouraged retail investors to buy TDIC shares, thus increasing the stock price and affording insiders the opportunity to sell their own shares at the inflated price. Examples of social media posts promoting TDIC to retail traders are below:

an entire channel, which can be viewed or read by the entire membership of that channel, or users can send direct messages to other Discord users, which can be viewed or read by the recipient user.

[6] A short seller profits from the expected decline in a stock's price by borrowing shares and selling those shares immediately, expecting to buy back the shares later at a lower price. Because the short seller must eventually return the stock regardless of its price, there is no mathematical limit to a short seller's potential losses. As a result, many short sellers will, as a matter of risk management, close their positions by repurchasing the stock if its price rises to a certain level.

← **Post**

**Timothy Sykes**
@timothysykes

WOW, what a squeezer we have now in $TDIC from the $1s to the $11s now in 2 days, BIGGGGGGG congrats to these great upcoming tim.ly/sykeschallenge students, please retweet and congratulate them in challenge chat, even if you sell too soon, it's a GREAT lesson and opportunity for everyone!!! Please tell me you see this too, whewwwww, after $WOK $AIIO $FCHL $OCG $VELO on and on and on and on....can you imagine the craziness coming in June with no PDT Rule?!?! Whewwwww

garytaylor: $TDIC : $3.90 -> $9.04 : Took off another 1/4 into the halt for +131.8% Appreciate your good example when it comes to patience.

Rumteen: $TDIC star of the day. in 3.09 out 4.00

Raj_Anamika: in small $TDIC 5.67 looking for new highs, out $TDIC 7.1

TechST: Sold $TDIC in @ $5.60 and out @ $7.90. Played it safe... LOL!




26. At around the same time of the Brokerage-1 account compromise and the short squeeze promotional activity, the Subject Account sold a massive quantity of TDIC shares at an inflated price. As set forth below, on or about May 14, 2026, Imperial Vision, using the Subject Account, sold approximately 1,486,841 shares of TDIC for total proceeds of approximately $17,692,745.89, or approximately $11.90 per share.

27. By the end of the trading day on May 14, 2026, the share price of TDIC declined to $0.80. On June 12, 2026, TDIC's share price closed at $0.23.

**The Subject Account**

28. On or about August 8, 2025, Imperial Vision opened the Subject Account at Clear Street LLC ("Clear Street"). Clear Street is headquartered in Manhattan, and to open its

account at Clear Street, Imperial Vision communicated electronically with Clear Street personnel based in Manhattan. Imperial Vision claimed to Clear Street to be an investment fund based in Hong Kong (where Dreamland is also purportedly based) and incorporated in the Cayman Islands (where Dreamland is also purportedly incorporated) that launched in September 2024.

29. As set forth above, Dreamland informed FINRA that Imperial Vision purchased, through Dreamland's FPO, approximately 229,080 (post-split) shares of TDIC, and purchased and exercised warrants to acquire another 1,145,400 (post-split) shares of TDIC. On or about April 27, 2026, Imperial Vision transferred these approximately 1,374,480 shares of TDIC into the Subject Account.

30. Between on or about April 22, 2026 and on or about May 13, 2026, Imperial Vision purchased approximately 4,168,678 shares of TDIC in the Subject Account for a total cost of approximately $7,333,434.49, or an average price of approximately $1.76 per share. During this timeframe, Imperial Vision also sold approximately 683,503 shares of TDIC in the Subject Account for total proceeds of approximately $993,035, or an average price of approximately $1.45 per share.

31. On or about May 14, 2026, Imperial Vision sold approximately 1,486,841 shares of TDIC for total proceeds of approximately $17,692,745.89, or approximately $11.90 per share. Imperial Vision subsequently transferred nearly all remaining shares of TDIC from Clear Street to a foreign brokerage, leaving only 3,090 shares of TDIC in the Subject Account.[7]

32. On or about May 18, 2026, Imperial Vision purchased the following securities in the Subject Account for a total cost of approximately $847,170.65:

---

[7] As noted above, these 3,090 shares of TDIC have become 123 shares due to a 1-for-25 reverse stock split that occurred on or about June 15, 2026.

| Security | Ticker | Quantity | Total Cost |
|---|---|---|---|
| Vanguard Total World Stock Index ETF | VT | 500 | $76,760.65 |
| Oracle Corp. | ORCL | 500 | $93,092.50 |
| Microsoft Corp. | MSFT | 500 | $210,537.50 |
| Alphabet Inc. | GOOGL | 500 | $201,932.50 |
| NEOS Nasdaq-100 High Income ETF | QQQI | 1,000 | $56,475.00 |
| SPDR Gold Shares | GLD | 500 | $208,372.50 |

33. On or about June 8, 2026, Imperial Vision requested instructions from Clear Street on wiring out the cash proceeds in the Subject Account.

34. On or about June 15, 2026, pursuant to the Seizure Warrant (Ex. A), the Government seized the Defendants-*in-rem*. Specifically, the Government seized from the Subject Account: (i) the securities specified immediately above, along with 123 shares of TDIC (i.e., the Seized Shares); and (ii) approximately $8.4 million in cash (i.e., the Seized Cash).

## III. <u>FIRST CLAIM FOR FORFEITURE</u>

**Forfeiture Under 18 U.S.C. § 981(a)(1)(C)**
**(Property Constituting or Derived from Proceeds Traceable to Wire Fraud or Securities Fraud, or Property Traceable to Such Property)**

35. Paragraphs 1 through 34 of this Complaint are repeated and re-alleged as if fully set forth herein.

36. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in Section 1956(c)(7) of this title, or a conspiracy to commit such offense, is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(C).

37. For purposes of Section 1956, "specified unlawful activity" includes "[a]ny

act or activity constituting an offense listed in section 1961(1) of this title…" 18 U.S.C. § 1956(c)(7)(A). Section 1961(1) lists, among other things, wire fraud (Section 1343) and fraud in the sale of securities.

38. By reason of the foregoing the Subject Assets are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to wire fraud and securities fraud.

## IV. SECOND CLAIM FOR FORFEITURE

**(Property Involved in Money Laundering, or Property Traceable to Such Property)**

39. Paragraphs 1 through 34 of this Complaint are repeated and re-alleged as if fully set forth herein.

40. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

41. Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .
>
> (B) knowing that the transaction is designed in whole or in part —
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

42. Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who conspires to commit any offense defined in Section 1956. As described above, for purposes of Section 1956, "specified unlawful activity," includes violations of 15 U.S.C.

§ 78j(b) and 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C. § 1343 (wire fraud).

43. Title 18, United States Code, Section 1957(a) imposes criminal penalties on any person who:

> in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

44. Title 18, United States Code, Section 1957(d) provides that "The circumstances referred to in subsection (a) are . . . that the offense under this section takes place in the United States."

45. Title 18, United States Code, Section 1957(f)(3) provides that "the term[] 'specified unlawful activity' . . . shall have the meaning given [that] term in section 1956 of this title."

46. By reason of the foregoing, the Defendants-*in-rem* are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), because the Defendants-*in-rem* constitute property involved in money laundering and in monetary transactions in property derived from specified unlawful activity, to wit, wire fraud and securities fraud.

[remainder of page intentionally left blank]

## V. CONCLUSION

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants-*in-rem* and that all persons having an interest in the Defendants-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
October 13, 2026

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By: ________________________
Alexander Li
Assistant United States Attorney
26 Federal Plaza, 38th Floor
New York, New York 10278
Tel: (212) 637-2265

**DECLARATION OF VERIFICATION**

HEATHER STACHNIK, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that she is a Special Agent with the Federal Bureau of Investigation; that she has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of her knowledge, information and belief; and that the sources of her information and the grounds of her belief are her personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed on October 13, 2026

Heather Stachnik
Special Agent
Federal Bureau of Investigation